MARK M. HATHAWAY ESQ.
(CA 151332; DC 437335; NY 2431682)
JENNA E. PARKER (CA 303560)
HATHAWAY PARKER INC.
445 S. Figueroa Street, 31st Floor
Los Angeles, California 90071
Telephone: (213) 529-9000
Facsimile: (213) 529-0783
E-Mail: mark@hathawayparker.com
E-Mail: jenna@hathawayparker.com
Attorneys for Plaintiff John Doe

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE,<br><br>     Plaintiff,<br><br>       v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; and DOES 1-20, inclusive.<br><br>     Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Title IX-Erroneous Outcome<br>2. Title IX-Selective Enforcement<br>3. 14th Amendment Procedural Due Process<br>4. Breach of Contract<br>5. Promissory Estoppel<br>6. Negligence<br>7. Violation of Cal. Civ. Code, § 51<br>8. Wrongful Termination |

COMES NOW PLAINTIFF John Doe ("Plaintiff" or "Doe"), by and through his attorneys Hathaway Parker Inc., as and for his Complaint, respectfully alleges as follows:

## **NATURE OF THIS ACTION**

1. This case arises out of the improper actions taken and the flawed Title IX procedures employed by Defendant the Regents of the University of California, also known as the University of California at Los Angeles ("Defendant" or "UCLA" or "Regents") concerning false allegations that Plaintiff John Doe ("John Doe"), a male

Ph.D. graduate student at UCLA, violated the UC Policy for Sexual Violence and Sexual Harassment.

2.   UCLA improperly banned Plaintiff from his housing and employment and suspended him for two-year years, prohibiting Doe from completing his doctoral degree at UCLA and causing the loss of his F-1 Visa, after a flawed Title IX investigation found John Doe responsible for just one of the thirteen alleged incidents of misconduct brought by his ex-fiancée, Jane Roe, a former UCLA student.

3.   Defendant Regents' improper actions and sanctions were eventually ordered set aside and vacated by California Superior Court Judge James C. Chalfant, but by then Plaintiff had suffered irreparable harm and damages caused by Regents' improper and unlawful acts.

## THE PARTIES

4.   Plaintiff JOHN DOE was, at all times relevant, a graduate student at the University of California, Los Angeles.

5.   Respondent REGENTS OF THE UNIVERSITY OF CALIFORNIA (hereinafter "University of California" or "UC Regents"), is the official name of the public corporation that governs and operates the University of California as a public trust through its 26-member board of Regents.  University of California Los Angeles is one of the 10 campuses of the University of California system and is located in Los Angeles, California.

6.   Non-party JANE ROE at all times relevant was a former UCLA student and is the complainant in the underlying Title IX misconduct adjudication process conducted by UCLA and respondent UC Regents.

7.   Plaintiff uses the pseudonyms of "John Doe" and "Jane Roe" in his Petition to preserve privacy in a matter of sensitive and highly personal nature, which outweighs the public's interest in knowing the parties' identity. Use of the pseudonyms does not prejudice Respondents because the identities of Plaintiff and the Reporting Party are known to Respondents. (See, *Starbucks Corp. v. Superior Court* (2008) 68 Cal.App.4th

1436 ["The judicial use of 'Doe plaintiffs' to protect legitimate privacy rights has gained wide currency, particularly given the rapidity and ubiquity of disclosures over the World Wide Web"]; see also *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531; *Johnson v. Superior Court* (2008) 80 Cal.App.4th 1050; *Roe v. Wade* (1973) 410 U.S. 113; *Doe v. Bolton* (1973) 410 U.S. 179; *Poe v. Ullman* (1961) 367 U.S. 497; *In Does I thru XXIII v. Advanced Textile Corp.* (9th Cir. 2000) 214 F.3d 1058.

8.   Plaintiff John Doe and Defendant Regents are sometimes hereinafter collectively referred to as the "parties."

## JURISDICTION AND VENUE

9.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (i) John Doe states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution

10. This Court has personal jurisdiction over Defendant Regents on the grounds that the University is conducting business within the State of California.

11. Venue for this action properly lies in this Central District pursuant to 28 U.S.C. § 1391 because UCLA is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

A.    SUMMARY OF RELEVANT FACTS.

### 1.    Jane Roe's February 13, 2017 Surprise Office Visit.

12. Plaintiff John Doe, a Chinese national PhD Chemistry/Biochemistry student on an F-1 student visa, first met Jane Roe when she was enrolled in Chemistry 14BL in the Spring Quarter of 2014.  Jane Roe and Plaintiff began a long-term romantic relationship sometime during the summer of 2014.

13. During the time in which the parties were romantically involved, Plaintiff

supported Jane Roe's lifestyle by showering Roe (and her extended family) with high valued gifts as well as loaning Jane Roe substantial amounts of money that were ultimately never entirely paid back to Plaintiff.

14. Plaintiff proposed marriage to Jane Roe in December 2016 and Jane Roe accepted his proposal, planning to get married after Plaintiff graduated with his doctorate in June 2017.

15. In early February 2017, however, Plaintiff learned that Jane Roe had been unfaithful to him throughout the course of their relationship.

16. Upon learning of Jane Roe's infidelity and deception, Plaintiff was naturally devastated and confused.

17. Before ending the relationship, terminating the engagement and cancelling the wedding, Plaintiff sought to confirm and verify whether or not Jane Roe was in fact having sexual relations with another person while engaged to be married to Plaintiff. The other person presented written evidence and proof of what Plaintiff did not want to believe, that Roe was in fact in a romantic relationship with another person, who was likewise unaware of Jane Roe's relationship with Plaintiff.

18. On or about Sunday, February 12, 2017, Plaintiff sought to break off his engagement with Jane Roe due to her infidelity and lies.  Jane Roe and Plaintiff agreed through text messages to meet at Jane Roe's house on February 12, 2017.  After meeting briefly outside her home, Jane Roe and Plaintiff agreed to meet on campus that afternoon to discuss their relationship, but that Sunday afternoon meeting never occurred.

19. Early in the morning of Monday, February 13, 2017, Plaintiff and Jane Roe agreed through text messages to meet after Plaintiff had finished teaching his classes and Jane Roe got off work to exchange property that each had in their possession.

20. Plaintiff then discovered that Jane Roe had withdrawn the entire balance, approximately $8,000, from their joint bank account.

21. Later that morning, about 9:45 a.m., Jane Roe suddenly and without an appointment, showed up at Plaintiff's teaching assistant office.  Jane Roe came to

confront Plaintiff without an appointment because, according to Jane Roe, Plaintiff was "always in his office" and even used to "live on campus."

22. Jane Roe claimed that she took the day off from work to go to Plaintiff's on-campus office to retrieve her Social Security Card, which she believed Plaintiff had in his possession for over three years, but she was "not sure." Jane Roe also claimed that she wanted to return everything that Plaintiff had ever bought or given her since the day they met, but only brought with her a single handbag, some jewelry, and a credit card that Plaintiff had given to Jane Roe.

23. Once she arrived at his UCLA office on the first floor of Young Hall, Jane Roe caused a scene by banging on his office door repeatedly, without announcing herself, until Plaintiff appeared and answered the door.

24. When he finally appeared from his office, even though he was busy meeting with another graduate student at the time, Plaintiff was surprised to see Jane Roe standing in his doorway, and said, "You cannot enter my office."

25. Jane Roe repeatedly demanded that Plaintiff return her social security card and also demanded that Plaintiff take the items she had brought with her. When Plaintiff asked for his engagement ring back, Jane Roe said she said that she had thrown it into the ocean.

26. Plaintiff explained that he needed to leave to teach a class and asked that Jane Roe wait until he was finished, but Jane Roe refused to let him leave the office.

27. Jane Roe said that she would not leave, continued to demand her social security card and other items, and said that she was going to call the police and that Plaintiff "would go to jail." Plaintiff did not believe he had Jane Roe's social security card, but he told Jane Roe that he would look through his belongings at a later time and return all her property to her.

28. Plaintiff continued to explain that he needed to leave to teach a class. Plaintiff asked that Jane Roe wait until he was finished, but Jane Roe refused to let him go.

29. Jane Roe attempted to call the police on her cell phone but did not have cell

service.

30. Jane Roe stood in the doorway, stretching her arms out to both sides, at one point placing her hand in front of her with her palm facing Plaintiff, and another time pointing her elbow towards Plaintiff.  Eventually, Plaintiff was able to get around Jane Roe and leave for class, clutching papers for his lecture in one arm.  Even then, Jane Roe followed Plaintiff and tried to prevent him from entering the classroom where he was to lecture.

31. After Plaintiff left to teach his class, Jane Roe called law enforcement and reported to the responding UCLA police officers that Plaintiff had pushed her in the upper torso area and had grabbed her wrist and forearm.

32. UCLA police then went to the classroom where Plaintiff was lecturing and waited until the end of class at approximately 10:45 a.m. to arrest Plaintiff for violation of Penal Code § 243(e)(1) (Domestic Battery), a misdemeanor.

33. UCLA PD contacted the Chinese Consulate to inform them of Plaintiff's detention and arrest, in compliance with departmental foreign national arrest and detention notification policy.

34. On February 13, 2017, Jane Roe did not sustain any injuries as a result of her encounter with John Doe.

35. Jane Roe never returned all of the items that Plaintiff had given her during the course of their relationship.

36. On February 13, 2017, Jane Roe was not an active student enrolled at UCLA.

37. On February 13, 2017, Plaintiff was an active graduate student in good standing at UCLA and maintained a teaching/research assistant office on the UCLA campus.

38. Plaintiff's first language is not English, his academic use of English at UCLA has been limited to the field of chemistry, and he needs a translator for issues that require a fluent and nuanced understanding of the English language and American legal terminology.

    **2.**    ***Jane Roe's Title IX Complaint.***

39. Although Jane Roe was not a student at the time, on February 20, 2017 UCLA Interim Title IX Coordinator Jessica Price discussed with Jane Roe options available to her as a Title IX complainant, including a no-contact order, and resources such as CARE. According to its website:

> CARE is a confidential place for survivors of sexual assault, dating and domestic violence, and stalking. Our CARE Advocates offer free consultation and supportive services to UCLA students, staff, and faculty. You can get help without formally reporting an assault or requesting formal treatment. In addition to advocacy, CARE also provides alternative healing groups to survivors. CARE also offers prevention education to the campus community.

40. Jane Roe misrepresented her student status to the University; however, UCLA could have easily verified her status.

41. UCLA offers extensive services and accommodations to accusers, i.e. "survivors" of sexual assault, dating and domestic violence, and stalking, including the service of a CARE advocate.

42. UCLA offers far fewer services and accommodations to accused students and does not allow anyone to advocate on behalf of an accused student.

43. UCLA's disparate treatment and resources for accused student versus accusers is a violation of Title IX and California's Unruh Civil Rights Act.

44. On April 13, 2017, UCLA Title IX Investigator Danica Meyers met with Jane Roe to inform her about the Title IX investigation process.  Jane Roe reported thirteen alleged instances of misconduct by Plaintiff, going back to the Fall of 2014.

45. Ultimately twelve of the thirteen allegations Jane Roe made against her ex-fiancée, Plaintiff, were not substantiated by the UCLA Title IX investigation and adjudication process.

46. Jane Roe also falsely claimed to UCLA Title IX that she had suffered a rib bone fracture as a result of the encounter with Plaintiff on February 13, 2017, even though photos taken by police of Jane Roe that morning show no bodily injuries.

47. On April 13, 2017, Jane Roe was not an active UCLA student attending classes.

### 3.   Defendant's Title IX Investigation.

48. On May 10, 2017, the Title IX Office and the Office of Student Conduct issued a joint Notice of Charges to Plaintiff, charging Plaintiff with violations of the university's student and faculty conduct policies relating to Dating Violence, Conduct that Threatens Health or Safety, Stalking, Sexual Harassment, Terrorizing Conduct, and Sexual Assault- Contact.

49. On May 10, 2017, the Office of the Dean of Students issued an immediate interim suspension against Plaintiff, banned him from University property, and immediately evicted him from University student housing without a hearing, pending resolution of the allegations contained in the Notice of Charges.

50. Plaintiff appealed the interim suspension and requested a special hearing with the Dean of Students Maria Blandizzi. After the special hearing on May 22, 2017, Dean Blandizzi modified the interim suspension to allow Plaintiff to participate in certain activities on campus.

51. On May 11, 2017, Title IX investigator/adjudicator Danica Myers requested for Plaintiff to meet with her and respond to the allegations but did not provide Plaintiff with any evidence, witness statements, or specifics other than what was provided in the Notice of Charges.

52. UCLA Title IX investigators are instructed to not record any witness interviews.

53. The standard of care for reasonable, thorough, and impartial investigations calls for the audio recording of important witness interviews.

54. UCLA had no record of the questions asked during witness interviews, the verbatim responses of the witnesses, nor the context of the witnesses' responses.

55. At some point, responsibility for the investigation was transferred from Danica Myers to an attorney, Title IX investigator/adjudicator Sonia Shakoori (SBN 285247.)

56. Sometime prior to July 25, 2017, Title IX investigator/adjudicator attorney Sonia Shakoori requested for Plaintiff to meet with her and respond to the allegations, but did

not provide Plaintiff with any evidence, witness statements, or specifics other than what was provided in the Notice of Charges.

57. On July 25, 2017, Title IX investigator/adjudicator Sonia Shakoori met with Plaintiff and his advisors and informed Plaintiff of his resources and options, including an overview of the investigation procedures.  Title IX investigator/adjudicator Sonia Shakoori did not provide Plaintiff with any evidence, such as Jane Roe's statement to review.  Plaintiff presented to attorney Sonia Shakoori a written statement of events and responded to her questions.

58. Under UCLA's policy, accused students may provide their own advisor, who may be an attorney, however, the advisor may not speak or participate in any way in the Title IX investigation/adjudication process, nor may the advisor advocate on behalf of an accused student.

59. On August 3, 2017, Title IX investigator/adjudicator Sonia Shakoori met with Jane Roe and her university-provided CARE advocate to explain the timeline of the process and to provide Jane Roe the opportunity to review and respond to Plaintiff's statement.

60. Between July 26, 2017 and August 9, 2017, Title IX investigator/adjudicator Sonia Shakoori obtained information from witnesses identified as Witness 1, Witness 2, Witness 3, and Witness 4.

61. On September 11, 2017, Title IX investigator/adjudicator Sonia Shakoori provided very limited access to the "the summary of information on which I would rely upon when making my findings and a final opportunity to comment and/or provide new information."

62. Title IX investigator/adjudicator Sonia Shakoori made the information available only through a secure online computer service that prevented Plaintiff from printing or downloading the documents, which could only be reviewed online, one page at a time.

63. The online-only viewing of the Title IX investigation summary of information was only available from September 11, 2017 to September 12, 2017.

64. On September 15, 2017, the Title IX Office and the Office of Student Conduct issued a joint amended Notice of Charges to Plaintiff that added numerous new charges, expanding the previous May 10, 2017, Notice of Charges letter from four to eight incidents of misconduct.

65. Regarding the February 13, 2017 encounter when Jane Roe came to his office unannounced, the amended Notice of Charges stated:

> It has been alleged that on February 13, 2017, Respondent engaged in one incident of Dating Violence as defined in UC SV and SH Policy Section II.B.1.c.i., in that he assaulted Complainant outside of his office located in Young Hall, in violation of Code Section 102.08 (Conduct that Threatens Health of [sic] Safety).

66. Under the September 15, 2017 Notice of Charges letter, Plaintiff was charged with a single incident of Dating Violence regarding February 13, 2017, on the grounds that he violated UCLA Student Code of Conduct section 102.08 by allegedly assaulting Jane Roe outside of his office.

67. That same day, September 15, 2017, Title IX investigator/adjudicator Sonia Shakoori notified Plaintiff that she anticipated issuing her Notice of Findings and Recommendations on the charges in the new Notice of Charges letter the following week.

68. On September 19, 2017, Title IX investigator/adjudicator Sonia Shakoori offered the Plaintiff and Jane Roe another limited opportunity to review and respond to the information that she may rely upon in making her findings.

69. On September 20, 2017, Plaintiff responded and provided additional evidence.

### 4.  Title IX Investigator Makes Ultimate Findings re Policy Violations.

70. On September 22, 2017, Title IX investigator/adjudicator Sonia Shakoori issued her Investigation Report to resolve the complaint submitted by Jane Roe against Plaintiff.  In her report, attorney Shakoori concluded that Plaintiff was not responsible for twelve of the thirteen allegations brought against him by Jane Roe but was

responsible for the February 13, 2017 encounter when Jane Roe came to Plaintiff's office unannounced to confront him.

71. UCLA provided only a redacted report, with unidentified witnesses, meaning that the University has improperly made decisions based on evidence and information not disclosed to Plaintiff.

72. UCLA failed to provide the opportunity for a prompt and fair hearing where the University shall bear the burden of proof, and at which the accused shall have the opportunity to present documents and witnesses and to confront and cross-examine witnesses presented by the University.

73. The sole Title IX investigator/adjudicator provided only narrative summaries and paraphrases of witness statements, not the actual witness statements, which fails to comply with the requirements of a fair, thorough, and impartial investigation.

74. By ignoring evidence and selecting only evidence that tends to support a finding of a violation, the University failed to properly weigh the evidence.

75. The sole Title IX investigator/adjudicator made findings of violations of policy that were not disclosed to Plaintiff in the Notice of Charges or amended Notice of Charges.

76. In her report, Title IX investigator/adjudicator Sonia Shakoori found that Jane Roe suffered no bodily injury on February 13, 2017.

77. In her report, Title IX investigator/adjudicator Sonia Shakoori cites no evidence that any conduct of Plaintiff on February 13, 2017 actually placed Jane Roe in reasonable fear of serious bodily injury.

78. The findings of Title IX investigator/adjudicator Sonia Shakoori that Jane Roe was placed in reasonable fear of serious bodily injury is unsupported by the weight of the evidence.

79. The findings of Title IX investigator/adjudicator Sonia Shakoori that Jane Roe was placed in reasonable fear of serious bodily injury is unsupported by substantial evidence.

80. Under the University of California Policy for Sexual Violence and Sexual Harassment (policy SVSH), "Dating Violence" is conduct by a person who is or has been in a romantic or intimate relationship with the Complainant that intentionally, or recklessly, causes bodily injury to the Complainant or places the Complainant in reasonable fear of serious bodily injury.

81. Under the UCLA Student Conduct Code, section 102.08, Conduct that Threatens Health or Safety is defined as:

> Conduct that threatens the health or safety of any person including, but not limited to physical assault, threats that cause a person reasonably to be in sustained fear for one's own safety or the safety of her or his immediate family, incidents involving the use or display of a weapon likely to cause great bodily harm, and intoxication or impairment through the use of alcohol or controlled substances to the point one is unable to exercise care for one's own safety, or other conduct that threatens the health or safety of any person.

82. Under the UCLA Student Conduct Code, section 102.09 Sexual Harassment is defined as the term is used in the University of California Policy for Sexual Violence and Sexual Harassment, i.e. as unwelcome sexual advances, unwelcome requests for sexual favors, and other unwelcome verbal, nonverbal or physical conduct of a sexual nature when:

> *Quid Pro Quo*: a person's submission to such conduct is implicitly or explicitly made the basis for employment decisions, academic evaluation, grades or advancement, or other decisions affecting participation in a University program; or

> *Hostile Environment*: such conduct is sufficiently severe or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs and services of the University and creates an environment that a reasonable person would find to be intimidating or offensive.

83. Under the UCLA Student Conduct Code, section 102.26 Terrorizing Conduct is defined as:

> Conduct, where the actor means to communicate a serious expression of intent to terrorize, or acts in reckless disregard of the risk of terrorizing, one or more University students, faculty, or staff.

> Terrorize means to cause a reasonable person to fear bodily harm or death, perpetrated by the actor or those acting under his/her control.

84. Although he was only charged with one incidence of Dating Violence under the UC SVSH policy in the Notice of Charges, Title IX investigator/adjudicator Shakoori also found that Plaintiff was responsible for violations of UCLA Student Conduct Code sections 102.08 (Conduct that Threatens Health & Safety), 102.09 (Sexual Harassment), and 102.26 (Terrorizing Conduct).

85. The finding by Title IX investigator/adjudicator Shakoori that Plaintiff was responsible for violation of UCLA Student Conduct Code section 102.08 (Conduct that Threatens Health & Safety) is unsupported by the weight of the evidence.

86. The finding by Title IX investigator/adjudicator Shakoori that Plaintiff was responsible for violation of UCLA Student Conduct Code section 102.08 (Conduct that Threatens Health & Safety) is unsupported by substantial evidence.

87. The finding by Title IX investigator/adjudicator Shakoori that Plaintiff was responsible for violation of UCLA Student Conduct Code section 102.09 (Sexual Harassment) is unsupported by the weight of the evidence.

88. The finding by Title IX investigator/adjudicator Shakoori that Plaintiff was responsible for violation of UCLA Student Conduct Code section 102.09 (Sexual Harassment) is unsupported by substantial evidence.

89. The finding by Title IX investigator/adjudicator Shakoori that Plaintiff was responsible for violation of UCLA Student Conduct Code section 102.26 (Terrorizing

Conduct) is unsupported by the weight of the evidence.

90. The finding by Title IX investigator/adjudicator Shakoori that Plaintiff was responsible for violation of UCLA Student Conduct Code section 102.26 (Terrorizing Conduct) is unsupported by substantial evidence.

### 5.   *Review by Director of Office of Student Conduct and Two-Year Suspension.*

91. On September 26, 2017, Plaintiff wrote to Jasmine Rush, Associate Dean of Students & Director of the Office of Student Conduct, to urge Dean Rush to reject the recommendations of Title IX investigator/adjudicator Shakoori.  Plaintiff presented factual and legal arguments for rejecting the findings of the investigator, such as the findings were unsupported by the evidence because there was no evidence of bodily injury nor placing of Jane Roe in reasonable fear of serious bodily injury, and pointed out:

> I have never physically assaulted, threatened, or harmed Ms. [Roe]. Ms. [Roe's] behavior is disturbing. She has engaged in a purposeful campaign to destroy my life. Her allegations are untruthful and were not supported by the evidence. Based on the foregoing, this Title IX case should be dismissed.

92. Under UCLA's procedures, Dean Jasmine Rush was to perform a paper-only review of attorney Sonia Shakoori's investigation and findings and decide whether to accept or reject Ms. Shakoori's opinions regarding responsibility and non-responsibility based on the preponderance or weight of the evidence.

93. On October 13, 2017, Dean Jasmine Rush issued her report, accepting the findings of non-responsibility for the twelve allegations and the finding Plaintiff had violated section II.B.1.c.i. (Dating Violence) of the UC SVSH Policy and UCLA Student Conduct Code section 102.08, Conduct that Threatens Health & Safety on February 13, 2017.

94. Dean Rush, however, determined that the preponderance of the evidence did not

support attorney Shakoori's opinion the Plaintiff violated Sections 102.09 and 102.26 of the UCLA Student Conduct Code regarding February 13, 2017.

95. In her report, Dean Jasmine Rush adopted the finding of Title IX investigator/ adjudicator Sonia Shakoori that Jane Roe suffered no bodily injury on February 13, 2017.

96. In her report, Dean Jasmine Rush references no evidence that any conduct of Plaintiff on February 13, 2017 actually placed Jane Roe in reasonable fear of serious bodily injury.

97. In her report, Dean Jasmine Rush made no finding that any conduct of Plaintiff on February 13, 2017 actually placed Jane Roe in reasonable fear of serious bodily injury.

98. The finding of Dean Jasmine Rush that Plaintiff had violated section II.B.1.c.i. (Dating Violence) of the UC SVSH Policy and UCLA Student Conduct Code section 102.08, Conduct that Threatens Health & Safety on February 13, 2017 is unsupported by the weight of the evidence.

99. The finding of Dean Jasmine Rush that Plaintiff had violated section II.B.1.c.i. (Dating Violence) of the UC SVSH Policy and UCLA Student Conduct Code section 102.08, Conduct that Threatens Health & Safety on February 13, 2017 is unsupported by substantial evidence.

100. Without providing any rationale, justification or explanation, Dean Jasmine Rush issued a sanction of a two-year suspension from UCLA, even though Plaintiff is completing his doctorate degree on an F-1 visa and a two-year suspension would be a *de facto* expulsion, resulting in Plaintiff having to leave the United States, or face deportation.

101. Dean Jasmine Rush did not take into consideration the impact on Plaintiff of separating him from his education and completion of his Ph.D. in Chemistry.

102. The two-year suspension imposed by the University served no educational purpose.

103. The two-year suspension imposed by the University was disproportionate to

the findings.

### 6.   *Defendant's Title IX Limited Appeal Process.*

104.   On October 27, 2017, Plaintiff timely filed his appeal from Dean Jasmine's findings and sanctions decision on the basis that (1) the decision was unreasonable based on the evidence; (2) the disciplinary sanctions were disproportionate to the findings; and (3) there was a procedural error in the process that materially affected the outcome.

105.   Jane Roe did not file an appeal from the findings and sanctions issued by Dean Rush.

106.   On November 1, 2017, Barbara Dalton notified Plaintiff that she would be serving as the UCLA Appeal Hearing Chair.

107.   Barbara Dalton is not a member of University staff or an academic appointee, but is an attorney (SBN #176251) and Vice President and Legal Director of Public Interest Investigations, Inc.[1]

108.   On November 14, 2017, Appeal Hearing Chair Barbara Dalton notified Plaintiff that he may proceed with arguments under Appeal Ground 1, Procedural Error, related to the issues with a Chinese-language interpreter during the Title IX investigation/adjudication process.  Plaintiff would also be allowed to proceed with several of his arguments brought under Grounds 2 and 4, but not on the other grounds set forth in his appeal.

---

[1]  Public Interest Investigations, Inc. provides Title IX investigation services to colleges and universities, and was involved in a number of Title IX campus investigations that are the subject of litigation. (see, *John Doe v. Occidental College*, Los Angeles Superior Court Case no. BS147275; California Court of Appeal Case no. B284707; *John Doe v. Occidental College*, Los Angeles Superior Court Case no. BS150532; California Court of Appeal Case no. B282292; *John Doe v. Occidental College*, Los Angeles Superior Court Case no. BS155004; California Court of Appeal Case no B282434; *John Doe v. Occidental College*, Los Angeles Superior Court Case no. BS156253; *John Doe v. Ainsley Carry, et al.*, Los Angeles Superior Court Case no. BS163736; *John Doe v. Samuel Glick, et al.*, Los Angeles Superior Court Case no. BS163739; *John Doe v. Occidental College*, Los Angeles Superior Court Case no. BS170573; *John Doe v. Regents, et al.*, Riverside Superior Court Case no. RIC1802988.

109.    The Appeal Hearing was conducted pursuant to Appendix E of the UC Sexual Violence and Sexual Harassment Policy, (University of California – Policy PACAOS-Appendix-E).

110.    During the Title IX appeal process, the University places the burden on Plaintiff to persuade the Appeal Panel by a preponderance of the evidence that Chinese-language translation issues materially affected the outcome of the investigation/adjudication process; that the University's decision was unreasonable based on the evidence; and, that the sanctions were disproportionate to the findings.

111.    For violations of the UCLA Student Conduct Code, such as section 102.08, Conduct that Threatens Health & Safety, the UCLA Student Conduct Code requires that the accused student must have a prompt and fair hearing where the University shall bear the burden of proof, and at which the student shall have the opportunity to present documents and witnesses and to confront and cross-examine witnesses presented by the University.

112.    UCLA failed to provide Plaintiff the opportunity for a prompt and fair hearing where the University shall bear the burden of proof, and at which the accused shall have the opportunity to present documents and witnesses and to confront and cross-examine witnesses presented by the University.

113.    In shifting the burden in the appeal, the accused student is required to disprove the Title IX investigator's opinion by a preponderance of the evidence, an all but impossible task.

114.    UCLA failed to provide Plaintiff an opportunity to question Jane Roe, the Complainant, if even indirectly.

### 7.    *The Appeal Hearing*

115.    On December 8, 2017, the Appeal Hearing went forward with Joseph Brown, Director of Graduate Student Affairs, and attorney Emily Scivoletto (aka Emily Leverenz Randon), UCLA Law School Associate Dean for Academic and Student Affairs, serving as the other two members of the three-member Appeal Body, together

with attorney Barbara Dalton.

116.   Neither Jane Roe nor Plaintiff testified during the Appeal Hearing.

117.   Dean Jasmine Rush testified that a two-year suspension is the minimum sanction for an instance of dating violence but did not provide any authority, rationale, or justification.

118.   The University policy does not require a minimum two-year sanction in instances of dating violence, only under certain circumstances.

119.   The University has no rationale for a minimum term of sanctions of two years suspension.

120.   The imposition of sanctions with no rationale is arbitrary and capricious.

### 8.   *Plaintiff has Exhausted Administrative Remedies.*

121.   On or about December 13, 2017, Plaintiff was notified that the Appeal Body denied his appeal and that that the Decision of Dean Rush is now final, and the sanctions are effective immediately.

122.   As of December 13, 2017, Plaintiff had no further avenue of administrative appeal and had exhausted his administrative remedies.

### 9.   *Plaintiff Has Exhausted Judicial Remedies.*

123.   On February 13, 2018, Plaintiff filed a Petition for Writ of Mandamus in the matter of *John Doe v. Regents* LASC case no. BS172217, alleging that Regents had failed to grant Plaintiff a fair hearing required by Code Civ. Proc., § 1094.5, committed a prejudicial abuse of discretion, failed to proceed in the manner required by law, issued a decision that is not supported by the findings, and made findings that are not supported by the evidence.

124.   On April 13, 2018, Superior Court Judge James C. Chalfant granted Plaintiff's motion to stay the decision and sanctions imposed by Regents on the grounds that Plaintiff would suffer irreparable harm without the stay, the stay was not against the public interest, and that the evidence did not support Respondents' findings.

125.   Even after Plaintiff was granted the stay, the Title IX suspension caused John

Doe to lose his F-1 Visa status, which became "out of status."

126.    On May 22, 2018, Regents filed their Confession of Judgment on the grounds that Regents believed that "John Doe's Petition for Writ of Mandamus should be granted in that a peremptory writ of administrative mandate should issue commanding the University to reconsider its action;"

127.    In submitting their Confession of Judgment, Regents conceded that their Title IX investigation process failed to comply with the fair hearing requirements of Code Civ. Proc., § 1094.5 and Title IX.

128.    On May 24, 2018, the Hon. James C. Chalfant entered Judgment against Regents.

129.    As of May 24, 2018, Plaintiff had exhausted his judicial remedies.

130.    Although Plaintiff obtained a stay of the suspension and sanctions on April 13, 2018 and Judgement was entered in his favor May 24, 2018, by that time irreparable damage had already been done due to Regents' bad acts.

## FIRST CAUSE OF ACTION

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*- Erroneous Outcome

### (Defendant Regents)

131.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

132.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

133.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant UCLA.

134.    Both the Department of Education and the Department of Justice have

promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

135.   In 2001, the Office for Civil Rights issued the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

136.   According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "*[accord] due process to both parties involved...*"[3]

137.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

    a.   "Notice . . . of the procedure, including where complaints may be filed";

    b.   "Application of the procedure to complaints alleging [sexual] harassment...";

    c.   "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

    d.   "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

    e.   "Notice to the parties of the outcome of the complaint......"[4]

---

[2] See generally U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX (2001) at 19-20, 21 & nn. 98-101

[3] *Id. at* 22 (emphasis added).

[4] *Id.* at 20.

138.   A school also has an obligation under Title IX to ensure that all employees involved in the investigation and adjudication process have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" [5]

139.   Further, Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.

140.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

141.   Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

142.   To succeed on an erroneous outcome claim, a plaintiff must demonstrate that there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff; and (3) specific circumstances suggesting gender bias led to the erroneous outcome.

143.   An "erroneous outcome" occurred in Plaintiff's case. Plaintiff was innocent and wrongly found to have committed a violation of UCLA's policies, and gender bias was a motivating factor.

144.   On April 4, 2011, the Office for Civil Rights ("OCR") of the United States

---

[5] *Id.* at 21.

COMPLAINT

21

Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at p. 4.

145.    The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses, and young men's cultural adherence to the sexual aggressor role.

146.    The DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

147.   On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." Id. at p. 31. While the Q&A advised that "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights…a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." Id. at p. 13.

148.   In April 2014, the White House issued a report entitled "Not Alone", which included a warning that if the OCR finds that a Title IX violation occurred, the "school risks losing federal funds" and that the Department of Justice ("DOJ") shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

149.   In June 2014, then Assistant Secretary of Education Catherine Lhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it may elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. To support enforcement of the DCL the OCR hired hundreds of additional investigators. To date, OCR has resolved 193 investigations of colleges for the potential mishandling of complaints of sexual violence, while 309 cases remain open. https://projects.chronicle.com/titleix/

150.   A pervasive atmosphere of anti-male bias within the Title IX enforcement

personnel at the University of California has resulted in an unprecedented amount of litigation in which the Superior Court of California has repeatedly held, on numerous occasions, that the University deprived the male student of a fair proceeding in adjudicating misconduct allegations.

151.   Upon information and belief, Defendant Regents possesses additional documentation demonstrating its unlawful pattern of gender-biased adjudications and disparate treatment applied to males and females.

152.   The foregoing combination of internal institutional pressure, ongoing OCR investigations, and pressure from the United States Department of Education, under a threat of recession of federal funds, contributed to an overzealous prosecution and erroneous finding of responsibility against Plaintiff.

153.   This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

154.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*- Selective Enforcement

### (Defendant Regents)

155.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

156.   As described above, the Title IX selective enforcement theory asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

157.   As detailed herein, the University of California violated Title IX's prohibition

against selectively enforcing its policies on the basis of gender.

158.    Specifically, Defendant Regents intentionally discriminated against Plaintiff because he is a male when it initiated the Title IX proceeding against Plaintiff in excess of its jurisdiction, imposed an unwarranted interim suspension that was in effect an expulsion, presumed him to be responsible for the alleged misconduct based on archaic stereotypes about males, permitted a single investigator to act as investigator, judge, jury and executioner, and imposed a "grossly disproportionate" and an excessively harsh and punitive sanction of a two year suspension, a de facto expulsion.

159.     Based on the foregoing, the actions taken and decisions made by Defendant Regents in carrying out the Title IX investigation and adjudication process were informed by Plaintiff's gender, without regard to guilt or innocence.

160.    Upon information and belief, the majority of Title IX cases at the University of California involve female complainants and male respondents.

161.    Upon information and belief, Plaintiff was found responsible and subjected to lengthy suspension because he is a male.

162.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

163.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION

### Denial of Fourteenth Amendment Due Process Rights Under 42 U.S.C. § 1983 (Defendant Regents, DOES 1-5)

164.    Plaintiff repeats and re-alleges each and every allegation hereinabove as though fully set forth herein.

165.    The Fourteenth Amendment to the United States Constitution provides that no

state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

166.  Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation or custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

167.  As aptly observed by California's Second District Court of Appeals: "Due process - two preeminent words that are the lifeblood of our Constitution. Not a precise term, but most everyone knows when it is present and when it is not. It is often most conspicuous by its absence. Its primary characteristic is fairness. It is self-evident that a trial, an adjudication, or a hearing that may adversely affect a person's life must be conducted with fairness to all parties."  (*Doe v. Regents of Univ. of California* (2018) 28 Cal. App. 5th 44, 46.)

168.  Given the severe implications of a responsibility finding in the university disciplinary context, an accused party must be afforded at least minimal procedural protections.

169.  Defendant Regents, in its adjudication of sexual misconduct and violence and levying sanctions against students, is a state actor exercising its jurisdiction over offenses that traditionally have been part of the responsibilities of the States.

170.  The U.S. Supreme Court has ruled that a not-for-profit athletic association's regulatory activity was state action owing to the "close nexus between the state and the challenged action," the pervasive entwinement of state school officials in the association's structure, and the lack of a countervailing reason against attributing activity to the government. In so ruling, the U.S. Supreme Court reviewed the various circumstances in which an ostensibly private actor has been treated as a state actor, 531

U.S. at 296:

     i.     when the challenged activity results from the State's exercise of "coercive power" and provides "significant encouragement, either overt or covert," *Blum* v. *Yaretsky* (1982) 457 U. S. 991, 1004;

     ii.     when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar v. Edmondson Oil Co.* (1982) 457 U. S. 922, 941;

     iii.     when a private actor is controlled by an agency of the state, *Pennsylvania v. Board of Directors of City Trusts of Philadelphia* (1957) 353 U.S. 230;

     iv.     when the private entity has been delegated a public function by the State, *West v. Atkins* (1988) 487 U.S. 42, 56; and

     v.     when the challenged activity is "entwined with governmental policies"; or when government is "entwined in [its] management or control," *Evans* v. *Newton* (1966) 382 U. S. 296, 299, 301.

171.    The key tests, then, are "Government coercion," "willful participation by the private actor," "Government control," "delegation of public function to private entity," and "entwinement with Government policy or Government management or control."

172.    In this case, with respect to Defendant Regents' adjudication of alleged intimate partner violence, there has been a delegation of the public function of the state in adjudicating sexual misconduct on college campuses thus creating a "close nexus between the state and the challenged action" such that the ostensibly private behavior "may be fairly treated as that of the state itself." Here, Regents' actions resulted from the government's exercise of "coercive power," where it provided "significant encouragement, either overt or covert," Regents operated as a "willful participant in joint activity with the state or its agents" and has been controlled by an "agency of the state" and, with the delegation of a public function by the state, such that the ostensibly private

entity is "entwined with governmental policies" or when government is "entwined in [the private entity's] management or control." *Brentwood*, 531 U.S. at 296.

173.    Upon information and belief, during the Obama Administration, Regents acted in response to the federal government's threat that colleges refusing to comply with the mandates of the Dear Colleague Letter would be found in violation of Title IX and be subject to substantial monetary penalties.

174.    Accordingly, Regents was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the April 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives concerning its handling of sexual misconduct matters on campus.

175.    Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

176.    When Regents investigated and adjudicated the complaint made against Plaintiff, and when it sanctioned him, Regents was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

177.    In the course of Regents' Title IX investigation and adjudication, it flagrantly violated Plaintiff's clearly established rights under the Due Process clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness by, without limitation:

178.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

179.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

180.    Prior to his interim suspension and later de facto expulsion, Plaintiff was a graduate student in good standing at UCLA.  His constitutionally protected property

interest in his continued enrollment at UCLA and to be free from arbitrary expulsion arises from the policies, courses of conduct, practices and understandings, established by UCLA.

181.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between UCLA and Plaintiff.

182.    Consequently, when Plaintiff faced disciplinary action that included the possibility of suspension or dismissal if found responsible, then UCLA was required to provide him with Due Process as established by the Fourteenth Amendment to the United States Constitution and established California law.

183.    Regents has a duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by Regents.

184.    Plaintiff had obeyed all institutional rules when he was wrongly suspended on an interim basis without a hearing and ultimately suspended for two years from his graduate program at UCLA.

185.    Under both federal and state law, Plaintiff was entitled to due process including proper notice and a meaningful opportunity to be heard.

186.    Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff.

187.    In the course of such investigation and adjudication, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness.

188.    Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair investigation free of bias, his right to be heard by an impartial factfinder, and his right to cross examine witnesses and challenge witnesses.

189. Defendants, as well as other agents, representatives, and employees of Defendant UCLA, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

190. As a direct and proximate result of the above conduct, Plaintiff has sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

191. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FOURTH CAUSE OF ACTION

### Breach of Contract

### (Defendant Regents)

192. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

193. It is well established that the basic relationship between a student and a university is contractual in nature. *Kashmiri v. Regents of Univ. of California,* 156 Cal. App. 4th 809 (2007), *as modified* (Nov. 15, 2007), *as modified* (Nov. 28, 2007). "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created...." *Id. (internal citations omitted).*

194. At all times relevant hereto, a contractual relationship existed between UCLA and Plaintiff through UCLA's policies and procedures governing the student disciplinary system.

195. Through the documents it publishes and provides to its students, UCLA and Regents make express contractual commitments to students involved in its disciplinary process.

196. Plaintiff applied to and chose to enroll in UCLA for which all associated tuition, fees, and expenses were paid in exchange for a commitment to his academic

graduate program. Plaintiff did so in reliance on his understanding, and with the reasonable expectation that UCLA would adhere to its stated policies, including its policies related to the adjudication of misconduct matters, and would implement and enforce its policies as set forth in its official publications.

197.   Based on the foregoing, UCLA created express and implied contracts with Plaintiff.

198.   UCLA, through its Title IX Coordinator and Title IX investigator, further made express representations to Plaintiff concerning his "rights" in the investigative process.

199.   In addition to violating the terms of its own Policies, UCLA violated the covenant of good faith and fair dealing implied in every contract, which implicitly guaranteed that any proceedings would be conducted with basic fairness.

200.   Based on the aforementioned facts and circumstances, UCLA breached express and/or implied agreement(s) with Plaintiff.

201.   Regents committed multiple breaches of its agreements with Plaintiff during the investigation and adjudication process, including, without limitation, imposing an interim suspension on Plaintiff despite a lack of reliable evidence and lack of a hearing.

202.   As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, reputational damage, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

203.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

### FIFTH CAUSE OF ACTION

**Promissory Estoppel**

**(Defendant Regents)**

204.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

205.   UCLA's various policies constitute representations and promises that UCLA should have reasonably expected to induce action or forbearance by Plaintiff.

206.   UCLA expected or should have reasonably expected Plaintiff to accept its offer of admission, incur expenses, and choose not to attend other colleges based on its express and implied promises that UCLA would not discriminate against Plaintiff and would not deny him his procedural rights should he be investigated for an alleged violation of the University's policies.

207.   Plaintiff relied to his detriment on these express and implied promises and representations made by UCLA.

208.   Based on the foregoing, UCLA is liable to Plaintiff based on estoppel.

209.   As a direct, reasonable and foreseeable consequence of these breaches, Plaintiff sustained damages, including without limitation, economic injuries, the inability to complete his studies at UCLA or transfer to another college of equal caliber, and other direct and consequential damages.

210.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## SIXTH CAUSE OF ACTION

### Negligence
**(Defendant Regents)**

211.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

212.   In order to state a negligence claim under California law, a plaintiff must show that the defendant owed the plaintiff a duty, defendant breached that duty, and such breach was the proximate cause of plaintiff's damages.

213.   California courts have recognized the "special relationship" that exists between a university and its students, which gives rise to a duty of care "while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services. (*Regents of University of California v. Superior Court*

(2018) 4 Cal.5th 607, 624-625.)

214.    Here, Defendant Regents formed a university-student relationship with Plaintiff and owed him a duty to conduct the disciplinary process with due care, to perform an investigation free from bias or conflict, and to ensure proper training to those responsible for investigating and adjudicating the alleged policy violations.

215.    Such duties arise from UCLA's relationship with Plaintiff, as a student of the University, an obligation acknowledged by UCLA's policies.

216.    The foregoing duties were breached when Plaintiff did not receive the full protections of the disciplinary process, and when he was subjected to biased, defective and flawed procedures and an improper decision unsupported by evidence.

217.    Plaintiff suffered injuries as a direct result of Defendant's breach of the duties owed to him as a graduate student of UCLA, including loss of educational and career opportunities, economic losses, emotional and reputational damages.

218.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## SEVENTH CAUSE OF ACTION

### Violation of California Civil Code, § 51

### (Defendant Regents)

219.    John Doe repeats and realleges each and every allegation herein above as if fully set forth herein.

220.    The California Civil Code § 51, also known as the Unruh Civil Rights Act provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

221.    UCLA's policies provide, among other things:

> The University of California, Los Angeles is committed to creating and maintaining a community where all persons who participate in University programs and activities can work and learn together in an atmosphere free of all forms of harassment, exploitation, or intimidation. Every member of the University community should be aware that the University is strongly opposed to sexual harassment and sexual violence and that such behavior is prohibited both by law and University policy, including the University of California Policy on Sexual Violence and Sexual Harassment ("UC SV and SH Policy") and the UCLA Student Conduct Code ("UCLA Conduct Code").

222.   UCLA is a "business establishment" within the meaning of California Civil Code, § 51. Upon information and belief, UCLA maintains physical facilities, employs a significant number of paid faculty and staff, provides an education and academic experience to students, receives applications for admission from the general public, receives tuition payments and fees from its students and is governed by the University of California Board of Regents.

223.   UCLA denied Plaintiff the advantages, facilities, privileges and services afforded to students of UCLA by, among other things: conducting an investigation and adjudication process biased against the male accused; failing to afford John Doe the rights enumerated in its own guidelines and policies; failing to utilize the requisite preponderance of the evidence standard; and assessing a sanction that was disproportionate and unwarranted in light of the circumstances.

224.   UCLA intentionally engaged in the following discriminatory acts or practices against John Doe as the male accused: UCLA subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex; upon accepting Jane Doe's uncorroborated account of the events, the Committee discriminated against John Doe, based solely on his gender; the decision reached was discriminatory in that given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

225.   Based on the foregoing facts and circumstances, UCLA engaged in unlawful discriminatory practices in violation of California Civil Code, § 51.

226.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

227.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## EIGHTH CAUSE OF ACTION

### Wrongful Termination

### (Defendant Regents)

228.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

229.   As of May 2017, Plaintiff was employed by Defendant as a post-doctoral scholar and as a lecturer under a written agreement with Defendant.  At all times, Plaintiff performed all duties required of him more than adequately.

230.   From July l, 2017 to June 30, 2018, Plaintiff was to be employed by Defendant Regents under the prestigious Willard F. Libby Teacher-Scholar position in his department.  Defendant wrote, "We consider you one of the best young teachers and researchers in the country and look forward to your countless contributions to science and education at UCLA."  Defendant also agreed to pay union dues or fair share service fees required as a condition of employment for all postdoctoral scholars in the UC system.

231.   On May 10, 2017 after 5 p.m., Defendant improperly placed Plaintiff on interim restrictions and discharged Plaintiff from his employment without good cause as alleged above.

232.   As a proximate result of Defendant's conduct in terminating his employment without good cause, and without Due Process or a fair hearing as required by Title IX and Cal. Code Civ. Proc., § 1094.5, Plaintiff has suffered and continues to suffer losses

in earnings and other employment benefits to his damage in an amount to be established at trial.

233.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    On the First, Second, and Third Causes Of Action for violation of Title IX of the Education Amendments of 1972 and 14th Amendment Procedural Due Process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

2.    On the Fourth Cause of Action for Breach of Contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

3.    On the Fifth Cause of Action for Promissory Estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

4.    On the Sixth Cause of Action for Negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages

COMPLAINT

36

to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

5.   On the Seventh Cause of Action for violation of California Civil Code, § 51, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

6.   On the Eighth Cause of Action for Wrongful Termination, a judgment awarding John Doe damages in an amount to be determined at trial, including lost earnings and other employee benefits, past and future;

7.   For interest on lost earnings and benefits at the prevailing legal rate from May 10, 2017;

8.   For punitive damages in an amount appropriate to punish Defendant and deter others from engaging in similar misconduct;

9.   For reasonable attorney's fees incurred by Plaintiff as permitted by statute or contract;

10. For costs of suit incurred by Plaintiff; and

11. For such other and further relief as the court deems proper.


                                         HATHAWAY PARKER

Dated: December 6, 2019            By:   _____/S/_____
                                         MARK M. HATHAWAY
                                         JENNA E. PARKER
                                         Attorneys for Plaintiff

1

## JURY DEMAND

        Plaintiff John Doe herein demands a trial by jury of all triable issues in the

present matter

                                        HATHAWAY PARKER

Dated: December 6, 2019                 By:    _____/S/_____
                                        MARK M. HATHAWAY
                                        JENNA E. PARKER
                                        Attorneys for Plaintiff